CROSS v. PHARR.

4-8897 . 221 S. W. 2d 24

Opinion delivered June 6, 1949.

T. B. Vance and James F. Vance, for appellant.

Smith & Sanderson, for appellee.

GRIFFIN SMITH, Chief Justice. J. W. Pharr executed his last will September 2, 1926, and died April 1, 1928. A son, F. E. Pharr, was named executor, with power to close the estate "without being required to

execute bond, and without [the necessity] of accounting to the Probate Court, or having any probate proceedings other than proving up this will."

After providing for payment of debts the estate, both real and personal, was devised and bequeathed "absolutely and in fee simple" to F. E. Pharr, with the right to manage, invest, reinvest, sell, etc. This power, however, was in the nature of a trust to continue for the lifetime of the testator's wife, Cary Ann Pharr; and during that period the executor or trustee was to pay Mrs. Pharr the net income arising from the estate, . . . "when and as the same may be needed by my said wife."

Cary Ann Pharr died August 7, 1947, and F. E. Pharr died September 1, 1939. State National Bank of Texarkana was appointed to succeed F. E. Pharr as executor, or trustee.

State National, treating itself as trustee accountable to a court of equity, filed its final settlement December 18, 1947, and in a chancery proceeding asked to be discharged. Lessie Surgeon Pharr was named as a defendant; and, with the Bank, is an appellee here. She is the widow and sole devisee of B. C. Pharr, a son mentioned in the second subdivision of Item III of the will, who died November 26, 1947—a little less than four months after his mother. If B. C.'s portion of his father's estate vested without affirmative action by the trustee Bank, when Cary Ann Pharr died, the decree respecting that interest is correct, requiring only a determination of *what* the interest was.

Appellants, some of the defendants below, are the surviving heirs of Elizabeth Pharr Cross, who is mentioned in the will, but who predeceased her father. By testamentary expressions Elizabeth's heirs were to stand in her stead.

The appealing defendants contend that the interest apportionable to B. C. Pharr, if he had lived, lapsed when the trustee failed during B. C.'s lifetime to terminate the trust by an actual distribution of the property.

The appellants also think the Bank's action in making certain payments to Cary Ann Pharr was unauthorized, and that the Bank should be charged with $15,649.22 representing a joint checking account used by J. W. and Cary Ann Pharr.

We deal with the subjects in reverse order.

For many years F. E. Pharr was chairman of the Bank's board of directors, and as such was active in the institution's affairs until shortly before his death. W. B. Oglesby was vice-president and trust officer, and testified. Ledger sheets and signature cards were identified, showing that on July 1, 1927, J. W. Pharr had a credit balance of $3,842.38, designated as account numbered 13,680. Mrs. "C. A. P. Pharr"—identified as Mrs. Cary Ann Pharr—had a separate account, No. 8021. It showed a balance of $3,782.80. On the sixth of July, 1927, new account No. 16,696 was opened in the names of "J. W. or Mrs. C. A. P. Pharr." To this account there was first credited $3,842.38, then $11,500. A credit indorsement of January 1, 1928, was "interest, $306.84." [Seemingly 4% for six months on the two items aggregating $15,342.38]. With this entry the account showed a balance of $15,649.22. When J. W. Pharr died he had a checking account with a balance of $1,430. The money was used to pay expenses not questioned here.

More than nineteen years—April 1, 1928, to August 7, 1947—elapsed between the death of J. W. Pharr and the death of his wife. During that period the trustees collected income on property owned by the decedent, of which slightly more than $10,000 came from commercial stocks. As a result, Cary Ann Pharr's credit balance October 29, 1936, was $28,415.47. Appellants say there was more than $15,000 of unused funds after withdrawals of $13,000 in 1944-'45-'46. The balance was $24,617.95 when Mrs. Pharr died.

The Bank's records fully sustain appellees' contention that it was J. W. Pharr's intention, when the joint account was opened, to establish a relationship whereby Cary Ann Pharr would, if the testator predeceased her,

take by the entirety. The writing was that ". . . each [agrees] with the other, and with the . . . Bank" that the funds were jointly owned, "with the right of survivorship."

We held in *Black* v. *Black*, 199 Ark. 609, 135 S. W. 2d 837, that an estate by the entirety could be created in personal property, and that when B, having a bank account, changed the status in a way making his wife joint owner, the surviving tenant took by the entirety. In that case a distinction was made between the bank deposit and money kept in a lock box. The case is conclusive of the survivorship rights contended for in the appeal here. The transactions clearly show J. W. Pharr's intention that ownership of the balance at the time he died would pass, thus saving Mrs. Pharr the cost and inconvenience of administration and eliminating claims to distributive shares.

Appellants complain that records identified by the witness Oglesby were not sufficient to establish J. W. Pharr's purpose to maintain the joint bank account with right of survivorship, and point to the fact that while serving in the dual capacity of executor of his father's estate, and chairman of the Bank's board of directors, erasures and substitutions were made in respect of the ledger pages. Where the original caption of the account was "J. W. or Mrs. C. A. P. Pharr," a pass book held by C. A. P. Pharr showed that on March 21, 1934, four lines were drawn through "J. W." and "F. E." was written. It is also urged that testimony given by Oglesby and records he introduced were inadmissible under § 2, Schedule, Constitution of 1874.

The constitutional objection, in principle, was decided against appellants' contention in *Mosely* v. *Mohawk Lumber Co.*, 122 Ark. 227, 183 S. W. 187. It was there said that the intent was to prevent a party to the suit from testifying, . . . "and the manager of [the lumber corporation] was not a party to the suit, within the meaning of the [restriction], which does not provide that persons interested in the result of the litigation shall be excluded from testifying." But even if it should

be conceded that Oglesby, acting as the Bank's agent, testified to transactions the Bank had had with J. W. Pharr, most of the records objected to were made at a time when the Bank was not officially serving the administration; and furthermore, Mrs. Pharr had a joint interest in these transactions, and she is not a party to the suit.

Appellants complain of F. E. Pharr's action, and of action of the Bank as Pharr's successor, in permitting Cary Ann Pharr to remain in the family residence rent-free. They also emphasize what is spoken of as improvident administration in paying to the testator's widow all income from investments. Particular stress is laid upon the Bank's action in retaining large deposits at insignificant interest rates. Good judgment, they think, required reinvestment of earnings under Court direction.

It is not urged that estate earnings were greater than the widow's necessities. Rather, it is insisted that private means were sufficient, and that the will discloses the testator's intent. It is true that the will directs payment of the net income "when and as the same may be needed"; and should we construe J. W. Pharr's plan as one reserving the income to actual necessities arising after Mrs. Pharr had exhausted her own funds, appellants would be correct. This, however, is not sufficiently shown to have been the testator's desire. It is pointed out that the income, when apportioned to the entire period affected, amounted to but $525 a year. Unless something appears in the will indicating a different purpose, it is ordinarily presumed that the trustor intended the beneficiary to be supported and maintained from estate income, or as is sometimes the case, from sale of a part of the corpus. See 101 A. L. R., 1461 *et seq.;* Restatement of the Law of Trusts, § 128, Comment "e"; Scott on Trusts, p. 672.

The final assignment of error has to do with the Court's action in holding that B. C. Pharr's interest vested when his mother died, and that inaction of the trustee did not affect his rights.

The will empowered the executor, "in the event he sees fit to do so" [after the widow's death] to divide the estate among those entitled to take, or to reduce it to cash. In either event distribution was to be made "as soon after the death of my said wife as is reasonably consistent with good management and good business."

We agree with the Chancellor that with the death of Cary Ann Pharr, B. C. Pharr acquired an immediate estate. Primarily, but only for life, the testator's concern was for his widow. But secondarily those standing in the relation of child and grandchild were the objects of solicitude. The widow's needs, and these alone, prompted the testator to create the trust. The law favors early vesting of estates. If in circumstances such as we have here there should be read into a testator's will a purpose to postpone investiture until the trustee had acted, it would be possible for all of the beneficiaries to die, and results wholly at variance with the ancestor's wishes could easily follow.

The Supreme Court of Connecticut, in commenting on the rule applicable to early vesting of estates, added: "Another rule of frequent and here of particular application is that if a future time or event is involved, the nature of the interest depends upon whether such future event or time concerns the gift itself or merely the payment of it; when futurity is annexed to the substance of the gift, the vesting is postponed, but if annexed to the time or payment only, the legacy vests immediately." *First National Bank* v. *Somers,* 106 Conn. 267, 137 Atl. 739.

The Chancellor correctly determined the controverted issues, hence the decree must be affirmed. It is so ordered.